# Exhibit A

**ELI GABAY, ESQUIRE**
**Identification No. 39983**
**1628 J.F.K. Boulevard**
**Suite 2200**
**Philadelphia, PA 19103**
**(215) 665-1100**
**LIONEL ARTOM-GINZBURG, ESQUIRE**
**Identification No. 88644**
**834 Chestnut Street, Suite 206**
**Philadelphia, PA 19107**
**(215) 925-2915**



*Filed and Attested by the Office of Judicial Records 17 JAN 2023 06:46 pm D. KIM*

| | |
|---|---|
| TAXI WORKERS' ALLIANCE OF PA.<br>(a nonprofit corporation)<br>4434 Lancaster Ave.<br>Philadelphia, PA 19104<br>and<br>ALASSAN JALLOH, individually and<br>on behalf of Taxi Workers' Alliance and<br>LUCKY MAN CAB CO.<br>5750 Walton Ave.<br>Philadelphia, PA 19143 | :COURT OF COMMON PLEAS<br>:PHILADELPHIA COUNTY<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: JANUARY TERM 2023 |
| vs. | :<br>: NO. |
| CITY OF PHILADELPHIA<br>Department of Aviation<br>1515 Arch Street, 14th Floor<br>Philadelphia, PA 19102 | :<br>:<br>:<br>: |

COMPLAINT IN EQUITY

**NOTICE**

You have been sued in court. If you wish to defend against the claim set forth in the following pages, you must take action within twenty (20) days after this complaint and notices are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone No.: 215-238-1701

## AVISO

Len han demandada a usted en la carte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene viente (20) dias asentar una compaensencia escritia o enpersona o con un abogadad y demandas en contra de su persona.  Sea avisoado que si usted noo se defiende, la corte tomara medidas y puededecidir a favor del demandante y requiere que usted cumpia con todas las proviciones de esta demanda.  Usted puede perder dinero o sus proiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE.  SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA ENCUENTRA ESTITA ABAJO PARA AVERIGUAR DONDE PUEDE CONSEGUIR ASTENCIA LEGA.

ASOCIACION DE LICENCIADOS DE FILADELFIA SERVICIO, DE REFERENCIA E
INFORMACION LEGAL
One Reading Center
Filadelfia, Pennsylvania 19107
Telefono: 215-238-1701

Case ID: 230101658
Control No.: 23012889

## GENERAL AVERMENTS

1. Plaintiff, Taxi Workers Alliance, is a nonprofit corporation located in Philadelphia, PA.

2. Plaintiff, Alassan Jalloh, is the Vice-President of the Taxi Workers' Alliance, with a place of business in Philadelphia County, and a PPA taxi medallion owner and a taxi driver in the City of Philadelphia, and therefore an interested party in the matter.

3. Plaintiff, Lucky Man Cab Co., is a Pennsylvania corporation with a principal place of business in Philadelphia, PA, owned by Plaintiff Alassan Jalloh.

4. Defendant, City of Philadelphia, Aviation Department, is a department of a municipality of the first class of the Commonwealth of Pennsylvania.

## BACKGROUND

5. The City of Philadelphia is the owner and operator of the Philadelphia International Airport. The City of Philadelphia has, in a meeting which was held on January 16, 2023, announced it is switching the zones of taxicabs and rideshare services at the Airport effective immediately.

6. The City of Philadelphia operates the Airport through the Department of Aviation, which was created by a voter referendum of City residents and prior to December 2022, was part of the Department of Commerce, and the Division of Aviation.

7. Pursuant to its Administrative powers under the Home Rule Charter, §4-300, the City has promulgated regulations ("Regulations") for ground service transportation at the Airport. A copy of those regulations, dated November, 2022, is attached hereto as Exhibit "A."

8. Plaintiff Jalloh is a medallion owner, through Plaintiff Lucky Man Cab Co.,  and a taxi driver who works at the Philadelphia International Airport pursuant to the Regulations.

9. Pursuant to the Regulations, taxi drivers are directed to enter the airport, where they are to enter an area designated as the Taxicab Staging Area, where they are then dispatched on a first-come first-served basis to Taxicab Feed Lines, and then to Taxicab Zones (the number of the taxi zone is undefined in the Regulations), where they may be hailed by the public. See Regulations, 10(G)(3)(b)(i).

10. Presently, the Zone designated for Taxicabs is Zone 5, which is within the immediate view of the public when they exit the terminals.

11. The placement of taxis in Zone 5, which is the Zone most immediate to the exit of the terminal, is important to note, as visibility is paramount to this public transportation mode known as taxicabs.

Case ID: 230101658
Control No.: 23012889

12. Taxicabs, which do not have the an "app" may only be hailed upon request of the user,[1] so being within the sight of customers is necessary to (a) in order to prominently present to them the taxicab vehicles, and process them immediately to their destinations and (b) indicate the amount of wait time for a taxicab.

13. The rideshare companies (as defined by Regulations 10(K)(4)(a)) have their own designated zone, Zone 7, on the other side of the terminal road, where they are to wait for the app to send them to the terminal. Zone 7 was "carved out" after they were moved from the other side of the terminal altogether-- front of the terminal-- due to rideshare drivers creating an extreme traffic problem and confusion whilst the typical rideshare driver was negotiating between the App and the would-be passenger via the App while on course or in front of the terminal. There is no mention of a Zone for rideshare companies anywhere in the Regulations-- it was granted to them without express authority in the Regulations.

14. Zone 7 is outside the view of the public, however, it is not as necessary that the Rideshare companies be in view of the public in view of the fact that they are hailed by phone application, not by people actually waving at them.

15. The Limousine companies, ("Limousines") have their own Zone, Zone 6, which is behind Zone 5; Limousines are reserved in advance, per the regulations, 10(H)(3)(d).

16. The Division of Aviation has now announced, without amending the Regulations, and without proper regulatory consideration of the affected parties, that the Rideshare companies will be assigned to Zone 5, and the Taxicabs will be moved to Zone 7.

17. This will have an adverse effect of further devastating the taxicab industry, which is still suffering from the Rideshare companies' entry into the market in 2013, causing tens of millions of dollars in losses in to the Taxicab business, that is largely still family-owned.

## PETITION FOR PRELIMINARY INJUNCTION

18. In Warhime v. Warhime, 860 A.2d 41, 46-47 (Pa. 2004), the Pennsylvania Supreme Court set forth a six point test for the granting of a preliminary injunction, to wit:

*(1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction*

---

1    While there are Apps connected to particular taxi dispatchers, a uniform App platform for all PPA Medallion Taxis is
     not readily in use.

Case ID: 230101658
Control No.: 23012889

*than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect the public interest."* Id.

19. Taxi workers and their families will suffer immediate and irreparable harm, perhaps leading to the final blow of death of their industry, if they are not permitted to stay in Zone 5, as they will be outside the view of the public, and "out of sight, out of mind."

20. An injunction would maintain the status quo, that is, taxicabs in Zone 5 and rideshare vehicles in Zone 7.

21. In a meeting between Airport officials and the Plaintiffs, the only stated reason for the move from Zone 5 to Zone 7 is that rideshare passenger are required to walk across the street to Zone 7.  Airport official cited the possibility of someone being hit in a marked crosswalk; although, no statistics have been made available indicating that such events have occurred.

22. All would-be passengers on the way to Zone 7 have to use a zebra crosswalk.  Proper use of this crosswalk eliminates the danger cited by the Defendant for rideshare passengers.

23. For that matter, any such danger posed in crossing the street by any would-be passengers is essentially the same for taxicabs or for rideshare passengers.

24. The zone granted to rideshare drivers is in the absence of regulation requiring same, as zones are specified as existing for taxicabs and limousines.

25. As an arbitrary decision of the CEO of the Airport system, this matter is actionable under the City Charter, 4-2700(e), and a right to relief is clear, as this ill-conceived plan will have the effect of putting the taxi industry out of business once and for all.

26. The proposed injunction places all parties back in the status quo position, but forces the City of Philadelphia to actually promulgate regulations to deal with this situation rather than dictate by *fiat*.

27. The public interest is met by the granting of this injunction, in that it would force the City of Philadelphia to follow its own regulations when making drastic changes to public conveniences.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an Order in the form attached hereto, GRANTING Plaintiff's Preliminary Injunction against Defendant.

COUNT II.

Procedural Due Process.

28.  Plaintiffs incorporate their averments, 1-27, as if set forth here in full.

29.  The Defendants, in their actions, as detailed above, have violated the provisions of the Philadelphia City Charter, the mechanisms by which the City promulgates and enforces regulations, and the Procedural Due Process Clause of the 5th and 14th Amendments to the U.S. Constitution.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an Order in the form attached hereto, GRANTING Plaintiff's Preliminary Injunction against Defendant.

Respectfully submitted,

ELI GABAY, ESQUIRE

LIONEL ARTOM-GINZBURG, ESQUIRE

January 17, 2023

VERIFICATION

I, Alassan Jalloh, of 5750 Walton Ave, Philadelphia, PA 19143, am a Plaintiff in the above-captioned action, and the Vice President of the Taxi Workers Alliance, and state that the facts contained in the preceding Complaint and Petition for Preliminary Injunction are true to the best of my knowledge, information, and belief.  I make this statement pursuant to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities.

January 16,  2023

_____
Alassan Jalloh

THE CITY OF PHILADELPHIA
DEPARTMENT OF COMMERCE
DIVISION OF AVIATION



*Filed and Attested by the
Office of Judicial Records
17 JAN 2023 06:46 pm
D. KIM*

AMENDMENT TO RULES & REGULATIONS FOR
PHILADELPHIA INTERNATIONAL AIRPORT RELATED TO THE CUSTOMER FACILITY
CHARGE

(Revised as of September 28, 2022, effective as of November 1, 2022)

The City of Philadelphia is the owner and operator of Philadelphia International Airport. The City of Philadelphia, through its Department of Commerce, Division of Aviation, hereby promulgates this Amendment to the Rules and Regulations for the administration and operation of Philadelphia International Airport.

The Rules and Regulations contained in Section 10 of the Rules and Regulations for Philadelphia International Airport are hereby repealed and replaced in their entirety by those Rules and Regulations contained in Exhibit A attached hereto and made a part hereof. All other existing Rules and Regulations, as they apply to Philadelphia International Airport and Northeast Philadelphia Airport, shall continue in full force and effect except as those expressly modified herein.

THE CITY OF PHILADELPHIA

By: *Anne K. Nadol, Director of Commerce*
—0DD9...
Anne Nadol
Director of Commerce

By: *keith Brune, Interim CEO*
—214...
Keith Brune, A.A.E., IAP
Interim Chief Executive Officer

Approved as to form:
DIANA P. CORTES, Esquire
City Solicitor

By: *Scott Schwarz*
Chief Deputy City Solicitor

Case ID: 230101658
Control No.: 23012889

EXHIBIT A

DocuSign Envelope ID: 32879AEA-A863-4AEA-B70F-AA41509C7A50

## SECTION 10 – COMMERCIAL GROUND TRANSPORTATION

### A.   APPLICABILITY

The following rules and regulations govern the operation of all Commercial Ground Transportation business upon Airport premises, including its Terminal Buildings, roadways, parking facilities and all other surface areas of the Airport. These rules and regulations apply to all Commercial Ground Transportation Operators including, but not limited to, the following:

> Rental Car Operators (On- & Off-Airport), Off-Airport Parking Operators (including valet service), Taxicabs, Limousines, Courtesy Vehicles, Van Service, Couriers, shuttle buses, mass transit, and delivery vehicles of all types.

No person shall operate any Commercial Ground Transportation Vehicle or valet service on, to or from the Airport except in accordance with these rules and regulations. Nothing contained in Section 10 shall be construed as imposing a fee on (1) City shuttle buses, or (2) Southeastern Pennsylvania Transportation Authority (SEPTA) or its agents.

### B.   ADDITIONAL DEFINITIONS

In addition to the definitions set forth in  Section  1.H.  of these rules and regulations, the following definitions are applicable to these rules and regulations:

**Courier** – Commercial enterprise which provides "for-hire" service to and contracts with any Airport Operator(s) to transport cargo, luggage, or other items.

**Dwell Time** – Varying time period during which certain Commercial Ground Transportation Operators may operate or idle within the Airport's Commercial Roadway System without incurring an additional fee.

**Dwell Time Fee** – Varying fee equivalent to the amount of one Per-Trip Fee for each additional fifteen (15) minute interval (or portion thereof) that a Commercial Ground Transportation Operator's vehicle is within the Commercial Roadway System beyond the applicable Dwell Time allowance.

**Fleet** – any group of two (2) or more vehicles owned and operated by a single Commercial Ground Transportation Operator.

**Off-Airport Operator** – any entity which is engaged in a commercial business and provides Airport passengers with transportation to and from its business location outside of the Airport premises using the Commercial Roadway System.

September 2022

Case ID: 230101658
Control No.: 23012889

**Off-Airport Parking Operator** – any entity which is engaged in the commercial business of operating one or more parking facilities located outside of the Airport premises and providing Airport passengers with transportation to and from its facilities using the Commercial Roadway System.

**Per-Trip Fee** – Fee (calculated based on the type of Commercial Ground Transportation Operator and type of Commercial Ground Transportation Vehicle) assessed against certain commercial operators (as set forth in Section 10.K.4. herein) each time such operators' vehicle(s) enter(s) the Commercial Roadway System (or other areas designated by the CEO) for the purpose of transporting Airport passengers.

**Privilege Fee** – Fee assessed against certain commercial operators and calculated based on a percentage of such entity's Gross Revenue.

**Wait Time** – A sixty (60) minute allowance period during which a Commercial Ground Transportation Operator may idle in the Airport's East Hold lot (or any other area designated by the CEO or his/her agent) for such purposes before either departing the Airport premises or entering the Airport's Commercial Roadway System for the purpose of retrieving any Airport passenger(s).

**Wait Time Fee** – Varying fee assessed against certain Commercial Ground Transportation Operators for exceeding the Wait Time.

**C.    PERMITTED USE OF AIRPORT**

1.    The CEO shall determine the capacity and use of the Airport roadways and shall regulate the manner, speed, direction, movement, placement and kind of vehicle traffic that shall be permitted to operate on the various Airport roadways. When, due to special activities, emergencies or other conditions, all as determined in the Philadelphia Police Department's, U.S. Department of Homeland Security's or the CEO's sole discretions, certain uses of a particular roadway or part of a roadway would create an undesirable impact upon Airport operations, any of the immediately aforementioned parties may limit or restrict the use of any roadway or part of a roadway.

2.    The use and occupancy of any Airport space or roadway, or the conduct of any business, including, but not limited to, courtesy vehicles, any commercial enterprise or other form of revenue-producing activity involving Commercial Ground Transportation is prohibited unless such conduct is in compliance with these Airport rules and regulations or any other rules established by the CEO.

3.    By operating any Commercial Ground Transportation Vehicles on the Airport, all Commercial Ground Transportation Operators are bound by all

Case ID: 230101658
Control No.: 23012889

Airport rules and regulations and warrant that their Commercial Ground Transportation Vehicles meet all requirements set forth in these rules and regulations, and further meet all applicable local, state and federal statutes, regulations, codes, ordinances, standards and directives.

4.  Commercial Ground Transportation Operators shall not park any vehicle at the curb of the Terminal Buildings at any time except to pick up passengers in the designated Loading Zone, and further, only for the period of time so indicated by any traffic control signal, sign and/or device or schedules approved in advance by the CEO or the Philadelphia Police Department. Commercial Ground Transportation Vehicles and all other vehicles shall only park in the areas designated by the CEO.

## D. **GENERAL TERMS AND CONDITIONS**

1.  Fees and Charges; Automated Vehicle Identification (AVI) System

   a.  All fees and charges fixed by the CEO for each class of Commercial Ground Transportation Vehicle or Commercial Ground Transportation Operator, as set forth in these rules and regulations, shall be paid when due.

   b.  So that the Division of Aviation may monitor ground transportation traffic and vehicles and collect any applicable fees and charges, all Commercial Ground Transportation Operators shall be required to comply with all rules and regulations relating to AVI pursuant to Section 10.K.6. herein. The AVI procedures developed pursuant to these rules and regulations shall be prominently displayed at the Airport, and a copy can be obtained through the Airport Operations Department at 215.937.6914. Failure of any Commercial Ground Transportation Operator and/or Driver to comply with AVI procedures may, in addition to any other remedy available or penalty imposed by law, result in the suspension of the privilege of picking up passengers at the Airport.

2.  Vehicle Standards

   a.  All vehicles used by Commercial Ground Transportation Operators and/or Drivers at the Airport shall be safe and in good condition without the need for major maintenance or repair, and shall comply with the Airport, local, state and federal motor vehicle codes ordinances, regulations, statutes, standards and/or directives with respect to inspection, safety and operation of vehicles.

      i.  The exterior of all Commercial Ground Transportation Vehicles shall be maintained in a clean, undamaged and

September 2022

Case ID: 230101658
Control No.: 23012889

otherwise intact manner present a favorable appearance, and only indicate the brand(s) operating the Commercial Ground Transportation Vehicle.

ii. The interior of all Commercial Ground Transportation Vehicles, including the trunk, shall be maintained in a clean condition so as to be free of trash, odors, dirt and grease. Interior seat fabric must not be ripped.

b. The CEO may prohibit from entering the Commercial Roadway any Commercial Ground Transportation Operator or Driver with a vehicle which: (i) is substantially damaged or in deteriorated condition such that the vehicle could cause harm or injury to a passenger; (ii) fails to display or immediately produce proof of valid and current state or governing authority inspection or registration; or (iii) fails to meet or comply with any applicable federal, state or local government rule, regulation, statute, code, ordinance, standard or directive, all of which shall be determined in the CEO's sole discretion.

3. Certification and Insurance

a. All Commercial Ground Transportation Operators shall have all required authorizations for the operation of its Commercial Ground Transportation service from the appropriate regulatory agency(ies). This may include, but not be limited to, the Philadelphia Parking Authority (PPA), the Pennsylvania Public Utility Commission (Pa PUC) or such other state regulatory agency, the Federal Highway Administration (FHWA), the Surface Transportation Board and/or the Division of Aviation, and such other authorizations or exemptions as may apply.

b. All Commercial Ground Transportation Operators shall carry insurance in the amount specified by the appropriate regulatory agency having jurisdiction over the operations of the Commercial Ground Transportation Operator, or as required by the Division of Aviation.

c. All Drivers shall be properly licensed as required by any or all applicable local, state or federal code, regulation, statute or ordinance.

d. All Commercial Ground Transportation Operators and/or their Drivers shall, upon the Division of Aviation's (or its agent's) request, present evidence satisfactory to the Division of Aviation (or its agent) of its authorization to operate and proof of automobile

September 2022

Case ID: 230101658
Control No.: 23012889

insurance. All Ground Transportation Operators and/or their Drivers shall further submit any changes in insurance coverage, replacement insurance policies or insurance policy renewals (as appropriate) to the Division of Aviation (or its agent)  upon the occurrence of such changes, and at any time at the Division of Aviation's (or its agent's) request.

4.      Compliance with Ordinances – Commercial Ground Transportation Operators shall comply with any and all requirements of the constituted public authorities, and with all federal, state and local statutes, codes, ordinances, regulations, standards or directives applicable to the Commercial Ground Transportation Operator and its use of the Airport, and with all Rules and Regulations pertaining to the conduct of operations at the Airport as may be promulgated by the City from time to time. Commercial Ground Transportation Operators shall furnish, at their own expense, all licenses, permits and authorizations necessary for its operations.

5.      Title VI Nondiscrimination – Commercial Ground Transportation Operators shall comply with all provisions of Title VI of the Civil Rights Act of 1964, Executive Order No. 12250 of the President of the United States, and all regulations promulgated thereunder, as amended, which are applicable to the Commercial Ground Transportation Operator and its use of the Airport.

6.      Third Party Agreements – No Commercial Ground Transportation Operator shall enter into an agreement with any third party whereby said third party will engage in any activities at the Airport to sell, provide, or collect money for the Commercial Ground Transportation Operator's services without receiving prior written approval from the CEO, which may be withheld at the CEO's sole discretion.

7.      Diversion of Trade – Commercial Ground Transportation Operators shall not willfully divert or attempt to divert any business away from the Airport for which the Division of Aviation would be entitled to a fee as provided herein.

8.      Indemnification – Commercial Ground Transportation Operators shall indemnify, defend and hold harmless the City, its officers, agents and employees from any and all claims, liabilities, losses, suits, damages and causes of action against the City, its officers, agents and employees, which may arise out of the performance or non-performance by the Commercial Ground Transportation Operator of the rights and privileges granted by these rules and regulations, and such defense, indemnity and hold harmless shall extend to any and all claims, liabilities, losses, suits, damages or causes of action of every kind or nature and shall include

September 2022

Case ID: 230101658
Control No.: 23012889

reasonable attorneys' fees and costs incurred in administrative, trial, appellate, review or collateral proceedings.

9.      Prohibition of Solicitation – No Commercial Ground Transportation Operator or Driver shall (i) permit any of its vehicles to "Cruise" the Airport roadways for the purpose of advertising its services or Soliciting fares or passengers; (ii) approach or permit any employee or agent to approach any person or persons, whether inside or outside of the Airport's Terminal Buildings, for the purpose of Soliciting fares or passengers; or (iii) occupy any loading zone or curbside space for the purpose of Soliciting fares or passengers. Solicitation of passengers or fares on any portion of the Airport shall be prohibited, except that:

a.      Taxicab Drivers holding lawful medallions issued by the PPA (or any other applicable state or local regulatory body) may engage in call and demand services, as defined by Pa PUC regulations, in the designated Taxicab Zones in accordance with the procedures set forth in Section 10.G.3. of these rules and regulations;

b.      Commercial Ground Transportation Operators may purchase display space from the Division of Aviation or its agent to advertise on Division of Aviation authorized, general use commercial billboards, sign boards, or advertising displays provided, however, that nothing herein shall prohibit or restrict the Division of Aviation's ability to disallow or reject any such proposed advertising;

c.      Commercial Ground Transportation Operators/Drivers which are retrieving pre-reserved passengers from the Airport may display a sign no larger than 8 ½ x 11 inches and bearing the name of the passenger only. No sign shall be permitted which states the name of the Commercial Ground Transportation Operator or the name of a specific destination being served; and

d.      Commercial Ground Transportation Operators may provide service to persons who, free of Solicitation, initiate communication with the Commercial Ground Transportation Operator/Driver.

Any Commercial Ground Transportation Operator, Commercial Ground Transportation Driver, or any other person who violates this Section 10.D.9. anywhere on Airport grounds shall be subject to a penalty or fine (in accordance with Appendix G) and/or suspension of its privilege of operating at the Airport in accordance with Section 10.L. herein.

10.     Signage – No Commercial Ground Transportation Operator shall erect, maintain or display any signs at any locations on the Airport without prior approval from the CEO.

September 2022

Case ID: 230101658
Control No.: 23012889

11.  Conduct of Commercial Transportation Operators and Drivers

a.  Commercial Ground Transportation Operators shall employ competent, courteous and efficient staff in such numbers as to properly conduct its operations at the Airport. Such operations shall be conducted in an orderly, quiet and law-abiding fashion. While on Airport property, Commercial Ground Transportation Operators and Drivers shall neither be intoxicated nor drunk, nor shall such persons possess, use, consume or distribute any type of liquor, alcohol, narcotics or other controlled substance. Commercial Ground Transportation Operators and Drivers shall not bring firearms onto Airport property. Neither Commercial Ground Transportation Operators, Drivers nor employees shall be permitted to solicit fares, to loiter, to play cards or to engage in gambling of any kind on the Airport. Drivers who are discourteous, disorderly or whose appearance is slovenly will not be permitted to operate at the Airport. Additionally, Commercial Ground Transportation Operators and their Drivers may be required to comply with any dress code which is established by the PPA or the Division of Aviation.

b.  Each of any of a Commercial Ground Transportation Operator's employees who is required to be licensed to operate any vehicle or to perform any service at the Airport shall be duly licensed and authorized in accordance with all applicable local, state or federal laws, codes, regulations, statutes and/or ordinances. Drivers who do not possess a valid driver's license or any other applicable operating requirements will not be permitted to operate at the Airport.

c.  Commercial Ground Transportation Operators and Commercial Ground Transportation Drivers shall not place, throw or drop waste, rubbish or refuse anywhere on Airport property except in waste receptacles. No automotive parts or fluids are to be deposited, abandoned, leaked or otherwise left on Airport property. See Section 2.F., Litter and Refuse.

d.  Commercial Ground Transportation Operators and Commercial Ground Transportation Drivers shall not perform any maintenance or repairs to their vehicles on Airport property, except in an emergency to make the vehicle immediately operable. Commercial Ground Transportation Operators and/or Drivers shall pay or reimburse the Division of Aviation upon demand for any cleanup costs incurred by the Division of Aviation, caused by or relating to

September 2022

Case ID: 230101658
Control No.: 23012889

the Commercial Ground Transportation Operator's or Driver's conduct or omission.

e. Commercial Ground Transportation Operators and Drivers shall not offer or give tips, gratuities or payments of any kind to employees or agents of the Division of Aviation, airlines or any other business entity operating at the Airport.

f. Commercial Ground Transportation Operators and Commercial Ground Transportation Drivers shall not interfere with Airport operations or activities, nor shall Commercial Ground Transportation Operators and Commercial Ground Transportation Drivers interfere with Division of Aviation or airline employees or agents in the performance of their duties.

g. Commercial Ground Transportation Operators and Commercial Ground Transportation Drivers shall only pick up passengers in Loading Zones or any other locations specifically designated for such purposes by the CEO.

h. Unattended Vehicles – Except as otherwise authorized by the CEO, Commercial Ground Transportation Drivers shall not leave Commercial Ground Transportation Vehicles unattended.

12. Subordination – There rules and regulations are subject and subordinate to any and all applicable City, State and Federal laws, regulations and ordinances. In the event that any of these rules and regulations either conflict with, or are rendered void or unenforceable by, any applicable laws, regulations or ordinances, or by any existing or future agreements between the City and any agency or instrumentality of the U.S. Government relative to the operation of the Airport (the terms and execution of which have been or may be a condition precedent to the receipt or reimbursement to the City of federal funds), then the relevant provision of such applicable law, regulation, ordinance or agreement shall govern.

## E. __RENTAL CAR OPERATIONS__

1. On-Airport Rental Car Operators

a. All On-Airport Rental Car Operators shall either maintain a ready car or turn around facility on the Airport or shall construct, install, maintain and operate, , at the On- Airport Rental Car Operator's sole cost and expense, not less than one telephone information station in the baggage claim area of each Terminal Building. These telephone information stations shall be constructed and installed in accordance with any Terminal Building design standards prescribed

September 2022

Case ID: 230101658
Control No.: 23012889

DocuSign Envelope ID: 32879AEA-A863-4AEA-B70F-AA41509C7A50

by the Division of Aviation. Rental Car Operators which do not own or operate a ready car or turn around facility on the Airport may request permission from the CEO or the appropriate concessionaire to construct, install, maintain and operate a telephone information station in the baggage claim area of each Terminal Building under the same terms and conditions as those Rental Car Operators who do own or operate a facility on the Airport including, but not limited to, payment of all On-Airport Rental Car Operators fees set forth in Section 10.K.1. below. The Division of Aviation shall only permit Rental Car Operators to install, maintain and operate telephone information stations as space permits, which decision shall be in the sole discretion of the Division of Aviation. The CEO may, at his/her option, require Rental Car Operators to contract with the appropriate concessionaire (as designated by the Division of Aviation) for the provision of direct line telephone service.

b.   On-Airport Rental Car Operators shall pick-up and discharge rental car patrons only at such areas designated for that purpose by the Division of Aviation.

c.   On-Airport Rental Car Operators shall be required to provide a surety bond payable to the "City of Philadelphia" in the amount based upon one of the following calculations:

   i.   For those On-Airport Rental Car Operators having operated on the Airport for one year or longer, the amount of the surety bond shall be one-quarter (1/4) of the prior year's total annual concession payments due the City.

   ii.   For On-Airport Rental Car Operators having operated from the Airport for less than one year the amount of the surety bond shall be one-quarter (1/4) of the estimated total annual concession payments due the City.

d.   All On-Airport Rental Car Operations are subject and subordinate to the provisions of any applicable act, law or regulation affecting the operation or the maintenance of the Airport, and any agreement, instrument or document heretofore or hereafter made between the City and the U.S. Government or Commonwealth of Pennsylvania relative to the operation or maintenance of the Airport, the execution of which has been or may be required as a condition precedent to the transfer of rights or property to the City for Airport purposes, or the receipt of federal or state funds for the improvements or development of the Airport, including, without limitation, the expenditure of federal or state funds for the

Case ID: 230101658
Control No.: 23012889

maintenance and/or development of the Airport under the provisions of the Federal Aviation Act of 1958 or under the provisions of Title 49 of the Code of Federal Register, as they may be amended from time to time. In the event that the U.S. Government or Commonwealth of Pennsylvania requires, as a condition precedent to the continued receipt or granting of funds for the improvement of the Airport, any actions, filings or reports by the Airport, or any modifications to these rules and regulations, then On-Airport Rental Car Operators shall undertake such action and/or provide such documentation which may be required as it relates to On-Airport Car Rental Companies, in the City's sole discretion, to enable the City to comply with such a requirement and to obtain or continue to receive said funds.

2.    Off-Airport Rental Car Operations

a.    Off-Airport Rental Car Operators shall not construct, install, maintain or operate any telephone information stations or direct line telephone service on any part of the Airport. Off-Airport Rental Car Operators further shall not contract for the use or provisions of direct line telephone service unless prior written approval is received from the CEO.

b.    Off-Airport Rental Car Operators shall pick-up and discharge rental car patrons only at such areas designated for that purpose by the Division of Aviation.

## F.    HOTEL/MOTEL OPERATIONS

Off-Airport Hotel/Motel Operators shall pick-up and discharge hotel/motel patrons only at such areas designated for that purpose by the Division of Aviation.

## G.    TAXICAB OPERATIONS

1.    Marking of Vehicles – All Taxicabs at the Airport shall mark their vehicles in accordance with the following standards, as promulgated and set forth by the PPA:

a.    Painted color(s) of the Taxicab's dispatch provider (or certificate holder if a partial rights cab under PPA regulations) and standardized name /insignia and phone number of dispatch provider as approved by the PPA;

b.    Taxicab ID numbers shall be posted on the front fenders of the Taxicab and on the rear of the Taxicab in lettering at least 5 inches in height. ID numbers shall appear as follows:

September 2022

Case ID: 230101658
Control No.: 23012889

"P-_____" or "Pa. P.U.C. No. A_____", as applicable;

c.    Current PPA and Pennsylvania inspection stickers;

d.    Pennsylvania "TX-_____" license plate; and

e.    Any other markings or requirements as the PPA (or other applicable state or local regulatory body) may require.

f.    Only Taxicabs with valid PPA-issued medallions which are permanently affixed to the vehicle are authorized to pick up passengers at the Airport, except those Taxicabs operating by prearrangement or reservation.

2.    Unattended Vehicles – Except as otherwise authorized by the CEO, Drivers shall not leave Commercial Ground Transportation Vehicles unattended.

3.    Taxicab Operations – Taxicab operations at the Airport shall be in accordance with the following:

a.    All Taxicabs and Taxicab Drivers shall (i) comply with all applicable AVI policies and procedures as set forth in Section 10.K.6. herein, and (ii) pay all required fees as set forth in Section 10.K.5. herein in order to operate on the Airport roadways for the purpose of picking up and discharging passengers. Such Airport passenger pick-up and discharge shall occur only at areas designated by the Division of Aviation.

b.    No Taxicab driver shall solicit, neither by word nor gesture, a passenger for transportation nor accept a passenger on the Airport other than in an area specifically authorized by these rules and regulations.

i.    Taxicab Zones - Taxicabs shall only be permitted to accept passengers on the Airport within the areas designated as Taxicab Zones. Taxicabs shall first enter the Taxicab Staging Area and shall advance and be dispatched on a "first-in/first-out" basis to the Taxicab Feed Lines and then to Taxicab Zones. Taxicabs shall not enter or occupy a Taxicab Zone unless or until authorized to do so by the CEO. Prior to each entry onto the Airport's Commercial Roadway System, all Taxicab Drivers shall enter the Commercial Roadway System through the AVI reader and pay the Egress Fee as required in Section 10.K.5.

September 2022

Case ID: 230101658
Control No.: 23012889

ii.    Reservations - Any Taxicab may accept passengers by prearrangement and reservation and in such case, the Taxicab shall not occupy the Taxicab Staging Area, Taxicab Feed Line, or Taxicab Zone, but rather use the Limousine Staging Area and/or Limousine Zone and shall pay the Per-Trip Fee set forth in Section 10.K.4.b. herein rather than pay the Egress Fee. Taxicabs operating under this paragraph must display on the dashboard, so as to be visible from outside the Taxicab, a manifest containing the airline, flight number and name of the passenger being met. In addition, any posted curbside parking time limits must be observed.

c.    Taxicabs are not permitted to park on any Airport roadways, Taxicab Staging Areas, Taxicab Feed Lines or Taxicab Zones, unless actively engaged in Commercial Ground Transportation at the Airport.

## H.    <u>LIMOUSINE OPERATIONS</u>

1.    Unattended Vehicles – Except as otherwise authorized by the CEO, Drivers shall not leave Commercial Ground Transportation Vehicles unattended. Limousine Drivers who wish to leave their vehicles and meet their passengers in the Terminal Building must park their vehicles in a public parking lot or garage.

2.    Limousine Drivers shall only use the Limousine Staging Areas while waiting for passengers.

3.    Limousine Operations – No Limousine shall park, stop, stand or operate upon Airport roadways except according to the following procedures:

a.    Limousine Operators and Limousines shall (i) comply with all applicable AVI policies and procedures as set forth in Section 10.K.6. herein, and (ii) pay all required fees as set forth in Section 10.K.4. in order to operate on the Airport roadways for the purpose of picking up and discharging passengers. Such Airport passenger pick-up and discharge shall occur only at areas designated by the Division of Aviation.

b.    No Limousine Driver shall solicit, neither by word nor gesture, a passenger for transportation nor accept a passenger on the Airport other than in an area specifically authorized by these rules and regulations.

September 2022

Case ID: 230101658
Control No.: 23012889

c.    Limousines shall load passengers and baggage only within designated Limousine Zones. Notwithstanding the immediately foregoing, if the Limousine Driver has parked his/her vehicle in a public parking garage or lot to meet his/her passenger in the Terminal Building, then the Limousine Driver may load passengers and baggage in that parking lot or garage.

d.    A Limousine shall only accept passengers on an advance reservation basis and whose destinations are within the Limousine's authorized operating area as set forth in the terms of the certificate, permit or license under which said Limousine is operating.

4.    Limousines are not permitted to park on any Airport roadways, Limousine Staging Areas or Limousine Zones unless actively engaged in Commercial Ground Transportation at the Airport.

I.    **<u>VAN SERVICE OPERATIONS</u>**

1.    Marking of Vehicles – All Van Service vehicles shall display:

a.    Current PPA and Pennsylvania inspection stickers;

b.    Pennsylvania "BA_____" license plate; and

c.    Any other markings or follow any and all requirements as the PPA (or other applicable state or local regulatory body) may require.

d.    The foregoing Sections 10.I.1.a. – c. shall not apply to Van Service vehicles engaged solely in interstate commerce; such vehicles shall instead bear markings required by any other applicable federal or state code, regulation, statutes, or ordinance.

2.    Unattended Vehicles – Except as otherwise authorized by the CEO, Drivers shall not leave Commercial Ground Transportation Vehicles unattended.

3.    Van Service Drivers shall only use the Van Service Staging Area for layovers in authorized operating schedules or while waiting for passengers.

4.    Van Service Operations – No Van Service Driver shall park, stop, stand or operate upon Airport roadways except according to the following procedures:

September 2022

Case ID: 230101658
Control No.: 23012889

    a.    Van Service Vehicles shall (i) comply with all applicable AVI policies and procedures as set forth in Section 10.K.6. herein, and (ii) pay all required fees as set forth in Section 10.K.4. in order to operate on the Airport roadways for the purpose of picking up and discharging passengers. Such Airport passenger pick-up and discharge shall occur only at areas designated by the Division of Aviation.

    b.    No Van Service Driver shall solicit, neither by word nor gesture, a passenger for transportation nor accept a passenger on the Airport other than in an area specifically authorized by these rules and regulations.

    c.    Van Services Drivers shall load passengers and baggage only within a designated Van Services Zone.

    d.    The CEO reserves the right to permit or require owners of Van Service vehicles to submit, for approval, operating schedules. Under this condition, owners of Van Service vehicles shall operate on time according to the appropriate operating schedule and shall park only within designated Van Service Zone at approved times.

5.    Van Service Drivers are not permitted to park on any Airport roadways, Van Services Staging Areas or Van Service Zones unless actively engaged in Commercial Ground Transportation at the Airport.

**J.**    **COURIER OPERATIONS**

1.    Marking of Vehicles – All Courier vehicles shall bear all applicable current state inspection and registration stickers.

2.    Couriers shall only park Courier Vehicles in designated Courier Staging Areas while making goods deliveries and/or pick-ups at the Airport.

3.    Courier Operations – No Van Service Driver shall park, stop, stand or operate upon Airport roadways except according to the following procedures:

    a.    Couriers shall (i) comply with all applicable AVI policies and procedures as set forth in Section 10.K.6. herein, and (ii) pay all required fees as set forth in Section 10.K.4. in order to operate on the Airport roadways for the purpose of retrieving and delivering packages. Such business shall occur only at areas designated by the Division of Aviation.

September 2022

Case ID: 230101658
Control No.: 23012889

b.   Couriers are not permitted to park Courier Vehicles on any Airport roadways, Van Services Staging Areas or Van Service Zones unless actively engaged in Commercial Ground Transportation at the Airport.

**K.   PAYMENT OF FEES-REPORTS AND RECORDS:  AUTOMATED VEHICLE IDENTIFICATION (AVI) SYSTEM**

1.   On-Airport Rental Car Operators – All On-Airport Rental Car Operators shall:

a.   Remit a Customer Facility Charge in the amount of $8 per rental day, which is imposed on each customer renting a motor vehicle from a Vehicle Rental Company doing business at Philadelphia International Airport. Customer Facility Charges shall be collected from the customer by the Vehicle Rental Company and held in a segregated trust fund for the benefit of the Airport. All other provisions in Subchapter C of Chapter 59 of Title 74 (74 Pa. C.S. Sections 5931-5933) are hereby incorporated herein by reference;

b.   Submit to the Division of Aviation a "Rent A Car (RAC) Operations PHL Customer Facility Charge (CFC) Report" indicating the number of rental car transactions and rental car transaction days. This report and the Customer Facility Charge are due no later than the last day of the month following the month in which charges are collected;

c.   Pay a Privilege Fee in the amount of ten percent (10%) of the Gross Revenue derived from the operation of its car rental business at the Airport. This Privilege Fee shall be due and payable on the twentieth (20th) day of the calendar month following the month in which the chargeable Gross Revenues were derived, along with the report described in Section 10.K.1.d below;

d.   Submit to the Division of Aviation a "Concessionaire's Monthly Report of Commission Accrued" (Form 72-89) indicating Gross Revenue by type (e.g. Time & Mileage, Fuel, Additional Driver, Baby Seat, Cellular Phone, etc.). This report and the monthly percentage fee payment are due within twenty (20) days of the end of each calendar month. This report shall be submitted for each month of operation regardless of whether there is any activity to report. The On-Airport Rental Car Operator's monthly payment of the fee based upon its Gross Revenue shall be based on this report and in the event the On-Airport Rental Car Operator fails to transmit this report and any corresponding payment due,

September 2022

Case ID: 230101658
Control No.: 23012889

the Division of Aviation shall compute the then-due monthly percentage fee based upon data available as though the fee due were the same as the fee during the highest reported month of operations. After receipt of the required Operator, the Division of Aviation shall recalculate the fee for the month in question based upon the report received plus interest as calculated in Section 10.K.1.g.i. If the actual fee plus interest is higher than that fee invoiced to the Rental Car Operator, the deficiency shall be paid by the Rental Car Operator along with the next monthly payment. If the actual fee is less than that fee invoiced to Rental Car Operator, the excess shall be credited to the Rental Car Operator's account;

e.    Keep full and complete books of accounts relating to the requirements of these rules and regulations and in so doing shall comply with the minimal procedural requirements prescribed by the City. The City, through its duly authorized representative, shall have the right to inspect and audit an On- Airport Rental Car Operator's books of accounts and other records at all reasonable times during normal business hours. If, as a result of such audit, it is established that On-Airport Rental Car Operator has understated the gross revenues received by it by five percent (5%) or more, the entire expense of said audit shall be borne by the On-Airport Rental Car Operator. On-Airport Rental Car Operators shall retain said records for a period of three (3) years and upon the City's request shall make such records available to the City for audit at the Airport or at some other mutually agreed upon location within twenty-five (25) miles of the Airport. Should adequate records not be made available by an On-Airport Rental Car Operator at the appointed locations, the additional cost of said audit including all reasonable travel, food and lodging expenses incurred by the City shall at the City's discretion be borne by On-Airport Rental Car Operator;

f.    Provide a certified written statement to the City, prepared by a certified public accountant within ninety (90) days of the end of each calendar year, showing the total percentage fee due for the said year. In the event that the sum of the actual amounts paid to the City by On-Airport Rental Car Operator exceeds the total percentage fees due for the year, such excess shall be credited to the On-Airport Rental Car Operator in the months following receipt of certified public accountant's statement. Such statement shall also contain a list of the Gross Revenue, by month, as shown on the books and records of On-Airport Rental Car Operator which were used to compute the monthly fee payments made to the City during the period covered by the statement, and the accountant's opinion that the percentage fees paid by the On-Airport Rental Car Operator to the City during the preceding year were made in accordance with the terms of these rules and regulations; and

g.  Pay all monthly payments on the due date as established herein.

i.  If the On-Airport Rental Car Operator fails to make payments due within ten (10) days of the due date interest shall automatically accrue on the late payment, without notice or opportunity to cure. The interest shall accrue as of the first (1st) day after the due date at the pro-rated rate of one and one-half percentage (1.5%) per month until fully paid.

ii.  If an On-Airport Rental Car Operator fails to make payments due within ten (10) days of the due date or fails to comply with any of these rules and regulations, the City may give the On-Airport Rental Car Operator notice of default. Failure to cure the aforementioned default within fifteen (15) days after the issuance of written notice may result in termination of the privilege granted under these rules and regulations without further notice and the exercise of all other remedies set forth in these rules and regulations or at law or equity.

iii.  All payments are due by 4:00 p.m. Eastern Standard Time on the due date. Any payment that is submitted by the On- Airport Rental Car Operator to cure a financial default must be received no later than 4:00 p.m. Eastern Standard Time on the final day of the cure period or such payment will not be accepted by the City as cure of the default.

iv.  The City's acceptance of any report, including but not limited to the "Concessionaire's Monthly Report of Commission Accrued," or acceptance of any payment shall not preclude the City from challenging the accuracy of the report or the payment amount and shall not be construed as a waiver of any of the City's rights. No right or remedy of the City set forth herein is intended to be exclusive of any other right or remedy herein or provided by law, but each shall be cumulative and concurrent and in addition to every other right or remedy herein or now or hereafter existing at law or in equity or by statute or ordinance.

2.  Off-Airport Rental Car Operators – All Off-Airport Rental Car Operators shall:

a.  Remit a Customer Facility Charge in the amount of $8 per rental day, which is imposed on each customer renting a motor vehicle from a Vehicle Rental Company doing business at Philadelphia International Airport. Customer Facility Charges shall be collected from the customer by the Vehicle Rental Company and held in a segregated trust fund for the benefit of the Airport. All other provisions in Subchapter C of Chapter 59 of Title 74 (74 Pa. C.S.

September 2022

DocuSign Envelope ID: 32879AEA-A863-4AEA-B70F-AA41509C7A50

Sections 5931-5933) are hereby incorporated herein by reference;

b.    Submit to the Division of Aviation a "Rent A Car (RAC) Operations PHL Customer Facility Charge (CFC) Report" indicating the number of rental car transactions and rental car transaction days. This report and the Customer Facility Charge are due no later than the last day of the month following the month in which charges are collected;

c.    Pay a Privilege Fee in the amount of ten percent (10%) of the Gross Revenue derived from the operation of any aspect of its car rental business at the Airport. This Privilege Fee shall be due and payable on the twentieth (20th) day of the calendar month following the month in which the chargeable Gross Revenues were derived, along with the report described in Section 10.K.2.d below;

d.    Submit to the Division of Aviation a "Concessionaire's Monthly Report of Commission Accrued" (Form 72-89) indicating Gross Revenue by type (e.g. Time & Mileage, Fuel, Additional Driver, Baby Seat, Cellular Phone, etc.). This report and the monthly percentage fee payment are due within twenty (20) days of the end of each calendar month. This report shall be submitted for each month of operation regardless of whether there is any activity to report. The Off-Airport Rental Car Operator's monthly payment of the fee based upon its Gross Revenue shall be based on this report and in the event the Off-Airport Rental Car Operator fails to transmit this report and any corresponding payment due, the Division of Aviation shall compute the then-due monthly percentage fee based upon data available as though the fee due were the same as the fee during the highest reported month of operations. After receipt of the required but delinquent payment and report from the Off-Airport Rental Car Operator, the Division of Aviation shall recalculate the fee for the month in question based upon the report received plus interest as calculated in Section 10.K.2.g.i. If the actual fee plus interest is higher than that fee invoiced to the Off-Airport Rental Car Operator, the deficiency shall be paid by the Off-Airport Rental Car Operator along with the next monthly payment. If the actual fee is less than that fee invoiced to Off-Airport Rental Car Operator, the excess shall be credited to the Off-Airport Rental Car Operator's account;

e.    Keep full and complete books of accounts relating to the requirements of these rules and regulations and in so doing shall comply with the minimal procedural requirements prescribed by the City. The City, through its duly authorized representative, shall have the right to inspect and audit an Off-Airport Rental Car Operator's books of accounts and other records at all reasonable times during normal business hours. If, as a result of such audit, it is established

Case ID: 230101658
Control No.: 23012889

that Off-Airport Rental Car Operator has understated the Gross Revenue received by it by five percent (5%) or more, the entire expense of said audit shall be borne by the Off-Airport Rental Car Operator. Off-Airport Rental Car Operators shall retain said records for a period of three (3) years and upon the City's request shall make such records available to the City for audit at the Airport or at some other mutually agreed upon location within twenty-five (25) miles of the Airport. Should adequate records not be made available by an Off-Airport Rental Car Operator at the appointed locations, the additional cost of said audit including all reasonable travel, food and lodging expenses incurred by the City shall at the City's discretion be borne by Off-Airport Rental Car Operator;

f.  Provide a certified written statement to the City, prepared by a certified public accountant within ninety (90) days of the end of each calendar year, showing the total percentage fees due for the said year. In the event that the sum of the actual amounts paid to the City by Off-Airport Rental Car Operator exceeds the total percentage fees due for the year, such excess shall be credited to the Off-Airport Rental Car Operator in the months following receipt of certified public accountant's statement. Such statement shall also contain a list of the Gross Revenue, by month, as shown on the books and records of Off-Airport Rental Car Operator which were used to compute the monthly fee payments made to the City during the period covered by the statement, and the accountant's opinion that the percentage fees paid by the Off-Airport Rental Car Operator to the City during the preceding year were made in accordance with the terms of these rules and regulations; and

g.  Pay all monthly payments on the due date as established herein.

i.  If the Off-Airport Rental Car Operator fails to make payments due within ten (10) days of the due date interest shall automatically accrue on the late payment, without notice or opportunity to cure. The interest shall accrue as of the first (1st) day after the due date at the pro-rated rate of one and one-half percentage (1.5%) per month until fully paid.

ii.  If an Off-Airport Rental Car Operator fails to make payments due within ten (10) days of the due date or fails to comply with any of these rules and regulations, the City may give the Off-Airport Rental Car Operator notice of default. Failure to cure the aforementioned default within fifteen (15) days after the issuance of written notice may result in termination of the privilege granted under these rules and regulations without

Case ID: 230101658
Control No.: 23012889

further notice and the exercise of all other remedies set forth in these rules and regulations or at law or equity.

iii. All payments are due by 4:00 p.m. Eastern Standard Time on the due date. Any payment that is submitted by the Off- Airport Rental Car Operator to cure a financial default must be received no later than 4:00 p.m. Eastern Standard Time on the final day of the cure period or such payment will not be accepted by the City as cure of the default.

iv. The City's acceptance of any report, including but not limited to the "Concessionaire's Monthly Report of Commission Accrued," or acceptance of any payment shall not preclude the City from challenging the accuracy of the report or the payment amount and shall not be construed as a waiver of any of the City's rights. No right or remedy of the City set forth herein is intended to be exclusive of any other right or remedy herein or provided by law, but each shall be cumulative and concurrent and in addition to every other right or remedy herein or now or hereafter existing at law or in equity or by statute or ordinance.

3.   Off-Airport Parking Operators

a.   This Section 10.K.3 shall apply to all Off-Airport Parking Operators not otherwise governed by leases, licenses, or other written agreements with the Division of Aviation, except as described in Section 10.K.3.a.i.

i. All Off-Airport Parking Operators, regardless of any lease, license, or other written agreement, shall adhere to Section 10.K.3.g, Accessibility for Individuals with Disabilities.

b.   Percentage of Gross Revenue. Each Off-Airport Parking Operator shall pay a Privilege Fee in the amount of ten percent (10%) of the Gross Revenue derived from the operation of its business from the Airport. This Privilege Fee shall be due and payable on the twentieth (20th) day of the calendar month following the month in which the chargeable Gross Revenue was derived, along with the report described in Section 10.K.3.b.i, below:

i. Each Off-Airport Parking Operator shall submit to the Division of Aviation a "Concessionaire's Monthly Report of Commission Accrued" (Form 72-89) indicating Gross Revenue by type. This report is due within twenty (20) days of the end of each calendar month. This report shall be submitted for each month of operation regardless of

Case ID: 230101658
Control No.: 23012889

whether there is any activity to report. The Off-Airport Parking Operator's monthly payment of the fee based upon its Gross Revenue shall be based on this report and in the event the Off-Airport Parking Operator fails to transmit this report and any corresponding payment due, the Division of Aviation shall compute the then-due monthly percentage fee based upon data available as though the fee due were the same as the fee during the highest reported month of operations. After receipt of the required but delinquent payment and report from the Off-Airport Parking Operator, the Division of Aviation shall recalculate the fee for the month in question based upon the report received plus interest as calculated in Section 10.K.3.e.i. If the actual fee plus interest is higher than that fee invoiced to the Off-Airport Parking Operator, the deficiency shall be paid by the Off-Airport Parking Operator along with the next monthly payment. If the actual fee is less than that fee invoiced to Off-Airport Parking Operator, the excess shall be credited to the Off-Airport Parking Operator's account.

c.   Each Off-Airport Parking Operator shall keep full and complete books of accounts relating to the requirements of these rules and regulations and in so doing shall comply with the minimal procedural requirements prescribed by the City. The City, through its duly authorized representative, shall have the right to inspect and audit an Off-Airport Parking Operator's books of accounts and other records at all reasonable times during normal business hours. If, as a result of such audit, it is established that Off-Airport Parking Operator has understated the Gross Revenue received by it by five percent (5%) or more, the entire expense of said audit shall be borne by the Off-Airport Parking Operator. Off-Airport Rental Parking Operators shall retain said records for a period of three (3) years and upon the City's request shall make such records available to the City for audit at the Airport or at some other mutually agreed upon location within twenty-five (25) miles of the Airport. Should adequate records not be made available by an Off-Airport Parking Operator at the appointed locations, the additional cost of said audit including all reasonable travel, food and lodging expenses incurred by the City shall at the City's discretion be borne by Off-Airport Parking Operator.

d.   Each Off-Airport Parking Operator shall provide a certified written statement to the City, prepared by a certified public accountant within ninety (90) days of the end of each calendar year, showing the total percentage fees due for the said year. In the event that the sum of the actual amounts paid to the City by Off-Airport Parking Operator exceeds the total percentage fees due for the year, such excess shall be credited to the Off-Airport Parking Operator in the months following receipt of certified public accountant's statement. Such statement shall

Case ID: 230101658
Control No.: 23012889

also contain a list of the Gross Revenue, by month, as shown on the books and records of Off-Airport Parking Operator which were used to compute the monthly fee payments made to the City during the period covered by the statement, and the accountant's opinion that the percentage fees paid by the Off-Airport Parking Operator to the City during the preceding year were made in accordance with the terms of these rules and regulations.

e.      Each Off-Airport Parking Operator shall pay all monthly payments on the due date as established herein.

    i.      If the Off-Airport Parking Operator fails to make payments due within ten (10) days of the due date interest shall automatically accrue on the late payment, without notice or opportunity to cure. The interest shall accrue as of the first (1st) day after the due date at the pro-rated rate of one and one-half percentage (1.5%) per month until fully paid.

    ii.     If an Off-Airport Parking Operator fails to make payments due within ten (10) days of the due date or fails to comply with any of these rules and regulations, the City may give the Off-Airport Parking Operator notice of default. Failure to cure the aforementioned default within fifteen (15) days after the issuance of written notice may result in termination of the privilege granted under these rules and regulations without further notice and the exercise of all other remedies set forth in these rules and regulations or at law or equity.

    iii.    All payments are due by 4:00 p.m. Eastern Standard Time on the due date. Any payment that is submitted by the Off-Airport Parking Operator to cure a financial default must be received no later than 4:00 p.m. Eastern Standard Time on the final day of the cure period or such payment will not be accepted by the City as cure of the default.

    iv.     The City's acceptance of any report, including but not limited to the "Concessionaire's Monthly Report of Commission Accrued," or acceptance of any payment shall not preclude the City from challenging the accuracy of the report or the payment amount and shall not be construed as a waiver of any of the City's rights. No right or remedy of the City set forth herein is intended to be exclusive of any other right or remedy herein or provided by law, but each shall be cumulative and concurrent and in addition to every other right or remedy herein or now or hereafter existing at law or in equity or by statute or ordinance.

    v.      All fees as set forth in this Section 10.K.3 shall be determined and

Case ID: 230101658
Control No.: 23012889

paid by Electronic Funds Transfer or Automated Clearing House to the Division of Aviation's Aviation Operating Account. All EFT or ACH transfers shall be made to:

> Wells Fargo Bank, N.A.
> Phone: 1-800-869-3557
> City of Philadelphia Aviation Division
> Aviation Operating Account
> Account #200-003-388-8734
> Routing Number: #121000248

f.  All Off-Airport Parking Operators shall obtain a window decal from the Division of Aviation, or its designee. Each decal will indicate the current year and will be reissued by the Division of Aviation on an annual basis. Off-Airport Parking Operators must affix the decal on a designated location on the windshield of each Off-Airport Parking vehicle. The decal must be current and displayed at all times while operating on Airport property.

g.  Accessibility for Individuals with Disabilities. Off-Airport Parking Operators shall have accessibility arrangements in place that comply with Section 9-1106 of the Philadelphia Code and Title III of the Americans With Disabilities Act, as they may be amended from time to time, and shall submit such arrangements to the City and the DOA on a yearly basis.

4.  Motor Carriers of Passengers and/or Property for Compensation

a.  Applicability - This Section 10.K.4. applies to any person, entity, Commercial Ground Transportation Operator or Driver, except as set forth below, who or which holds out, offers or undertakes service for compensation for the transportation of passengers or property, or both (each of the foregoing mentioned in this paragraph, a "Carrier"). This Section 10.K.4. does not apply to:

  i.   Vehicles operated by the Southeastern Pennsylvania Transportation Authority (SEPTA) or its agents;

  ii.  Motor Carriers operating call and demand service pursuant to the 53 Pa C.S. § 5701 *et seq.*;

  iii. Courtesy Vehicles; or

  iv.  Vehicles operated by persons, non-commercial entities or non-profit associations, such as schools, who or which are not primarily engaged in the transportation, rental car, parking or hospitality industries.

b.    Payment of Fees

i.    Per-Trip Fees - Each Carrier (as defined in Section 10.K.4.a. herein) shall pay a Per-Trip Fee each time the Carrier enters the Airport's Commercial Roadway System or other area designated by the Division of Aviation for picking up passengers or property (the "Carrier Per-Trip Fee"). The Carrier Per-Trip Fee assessed against each Carrier shall be determined by the number of seating positions specified by the vehicle manufacturer's designated seating capacity for that vehicle, including the driver. Carriers shall pay a Carrier Per-Trip Fee according to the following schedule:

ii.

| Seating Capacity | Per-Trip Fee |
|---|---|
| 1-5 | $1.50 |
| 6-12 | $3.00 |
| 13-24 | $8.00 |
| 25 and over | $22.00 |

iii.   Wait Time Fees – Carriers are afforded a Wait Time of sixty (60) minutes. Any Carrier which remains in the "hold lot" beyond the initial sixty (60) minute grace period shall be assessed an amount equivalent to one Per-Trip Fee for each sixty (60) minute interval (or portion thereof) thereafter. Notwithstanding the immediately foregoing, Taxis are exempt from all Wait Time Fees.

iv.   Dwell Time Fees – Upon entering the Commercial Roadway System, Carriers are afforded a certain amount of Dwell Time on the Commercial Roadway System according to the following schedule:

| Type of Operator | Dwell Time Allowance |
|---|---|
| Taxicab | Not Applicable |
| Courier | 60 minutes |
| Limousine | 20 minutes |
| Van/Shuttle | 30 minutes |
| Bus | 60 minutes |

Any Carrier which remains in the Commercial Roadway System beyond the applicable Dwell Time period set forth above shall be assessed a Dwell Time Fee equivalent to one Per-Trip Fee for each fifteen (15) minute interval (or portion thereof) thereafter.

September 2022

Case ID: 230101658
Control No.: 23012889

DocuSign Envelope ID: 32879AEA-A863-4AEA-B70F-AA41509C7A50

      v.     All fees as set forth in this Section 10.K.4 shall be determined and paid via the AVI system in accordance with the terms and conditions set forth in Section 10.K.6 herein.

      vi.    The rules and regulations requiring that all Commercial Ground Transportation Operators enter the Airport through the Commercial Roadway System and participate in the AVI System will be strictly enforced by the Philadelphia Police and Division of Aviation (or its agent's) personnel.

5.    Taxicabs

    a.    Egress Fee – Each Taxicab shall pay a charge of one and 50/100 dollars ($1.50) each time a Taxicab enters the Commercial Roadway System or other area designated by the CEO for picking up passengers.

    b.    Whenever there is an increase in the flag drop rate and/or mileage charge for taxicabs in cities of the First Class pursuant to an order of the PPA, or other agency having jurisdiction over taxicabs in the City of Philadelphia, the Egress Fee may, at the discretion of the CEO, increase by a percent equal to the percent of increase in the flag drop rate or mileage charge, whichever is greater.

    c.    Reservations – Taxicabs picking up by reservation and prearrangement shall pay Per-Trip Fees in accordance with the schedule of charges assessed by the Airport on Carriers as set forth in Section 10.K.4.b. in lieu of the Egress Fee set forth in this Section.

    d.    In the event that any provision(s) of these rules and regulations conflicts with any authorization or regulation of the PPA, then that authorization(s) and/or regulation(s) of the PPA (as applicable) shall govern.

6.    Automated Vehicle Identification (AVI) System

All Commercial Ground Transportation Operators and Drivers shall comply with any and all procedures established by the CEO (at the CEO's sole discretion) with respect to the AVI system. Such policies and procedures shall be posted prominently at the Airport and shall be available by calling the Airport Operations Department at 215.937.6914. Notwithstanding the immediately foregoing and the remainder of this Section 10.K.6, Courtesy Vehicle Operators are exempt from the AVI requirements set forth herein.

    a.    When so determined by the CEO, a Division of Aviation issued and installed AVI transponder will be required on each Commercial Ground Transportation Vehicle in order that the Division of Aviation may (1) monitor ground transportation activities, and (2) collect Per-

September 2022

Case ID: 230101658
Control No.: 23012889

Trip Fees and Egress Fees. Commercial Ground Transportation Operators and Drivers shall further establish AVI deposit accounts from which ground transportation fees shall be debited.

b.   AVI Transponders Required - Commercial Ground Transportation Operators shall obtain a Division of Aviation-issued AVI transponder for each of its vehicles which transports its customers to/from the Airport.

   i.   Infrequent Users - Notwithstanding 10.K.6.c. herein, in the event that a Commercial Ground Transportation Operator or Courtesy Vehicle Operator operates its vehicle(s) less than two (2) times per month per twelve (12) month period, then that Operator shall not be required to obtain an AVI transponder for that (those) vehicle(s), and instead shall have the option to either:

     (a)   Establish an AVI account and pay the applicable Per-Trip Fee; or

     (b)   Pay a one-time "infrequent user fee" which will allow the vehicle to retrieve Airport passengers during that trip according to the below fee schedule:

| | |
|---|---|
| Limousines/Shuttles | $20 |
| Vans | $30 |
| Buses | $50 |

c.   Commercial Ground Transportation Operators

   i.   Commercial Ground Transportation Operators shall file a signed application for each AVI transponder with the Division of Aviation and must follow the terms and conditions of the counterpart "Ground Transportation AVI Agreement" pursuant to all approved applications. (If the Commercial Ground Transportation Operator has been authorized by the Division of Aviation to use a non-Division of Aviation-issued transponder, then such operators shall separately register each AVI transponder with the Division of Aviation and shall follow the terms and conditions of the Ground Transportation AVI Agreement). Applicants shall be bound by all terms and conditions of the application and its counterpart agreement, including, but not limited to, late payment penalties (where applicable).

   ii.   Commercial Ground Transportation Operators shall keep the Division of Aviation advised of any and all changes in its or any of its employees' ability or authorization(s) to operate, and

September 2022

Case ID: 230101658
Control No.: 23012889

of any changes in Commercial Vehicles serving the Airport.

    iii.    Commercial Ground Transportation Operators shall maintain their respective AVI accounts in good financial standing.

d.    Taxicab Drivers & Couriers; Driver ID Tags Required

    i.    Recognizing that Taxicabs and Couriers often are operated by independent contractors rather than employees of the Operator, each Taxicab Driver and each Courier Driver must file with the Division of Aviation an application to obtain a Driver ID Tag, thereby establishing an AVI account, and shall be bound to all terms and conditions of the counterpart "Ground Transportation AVI Agreement" pursuant to an approved application.

    ii.    Driver ID Tags will be issued to Taxicab Drivers and Courier Drivers individually, and the Driver ID Tags must be scanned and registered by the AVI reader each time such Drivers enter the Airport's Commercial Roadway System (in addition to having the vehicle's AVI transponder scanned and registered).

    iii.    AVI accounts shall be maintained in good financial standing by the Taxicab Drivers and Courier Drivers individually and shall be debited and credited according to the Driver ID Tag being registered by the machine-reader each time the Driver enters the Commercial Roadway System.

e.    Transponder & Driver ID Tag Acquisition; Replacement Fees; AVI Account Maintenance Fees.

    i.    There is a non-refundable application fee of twenty dollars ($20.00) for each AVI transponder ("AVI Transponder Acquisition Fee").

    ii.    There is a non-refundable application fee of twenty dollars ($20.00) for each Driver ID Tag ("Driver ID Tag Acquisition Fee").

    iii.    The Division of Aviation will replace malfunctioning AVI transponders and Driver ID Tags at no charge to the Commercial Ground Transportation Operator. Notwithstanding the foregoing, if the Division of Aviation determines, in its sole discretion, that an AVI transponder or Driver ID Tag is malfunctioning due to abuse or neglect of the Commercial Ground Transportation Operator and/or Driver, whether intentional or unintentional, then such Commercial

September 2022

Case ID: 230101658
Control No.: 23012889

DocuSign Envelope ID: 32879AEA-A863-4AEA-B70F-AA41509C7A50

Ground Transportation Operator and/or Driver shall be responsible for replacement of the AVI transponder and/or Driver ID tag per 10.K.6.e.iv. below, and may be further subject to sanctions per Section 10.L. herein.

iv.  There is a non-refundable fee of ten dollars ($10.00) to replace (i) a lost or stolen AVI transponder and/or (ii) a lost or stolen Driver ID Tag. All Commercial Ground Transportation Operators and Courtesy Vehicle Operators are solely responsible for the safety and security of any AVI transponder(s) assigned to its vehicle(s) and any Driver ID Tag assigned to a Driver.

v.  All AVI Account holders must pay an annual administrative fee ("Account Opening & Renewal Fee") of twenty-five dollars ($25) per vehicle and/or Driver ID tag registered. The Account Opening & Renewal Fee is due at such time that the AVI account is established and shall cover a period of one (1) year. The Account Opening & Renewal Fee shall not be prorated. Thereafter, the Account Opening & Renewal Fee is due annually on date of the anniversary of the AVI Account opening. In the event of an AVI Account termination or closure, the Account Opening & Renewal Fee shall neither be prorated nor refunded.

f.  AVI Account Opening Balance & Maintenance

i.  Opening Balance - All Commercial Ground Transportation Operators must, prior to being issued an AVI transponder and/or Driver ID Tag, establish an AVI deposit account through which the Commercial Ground Transportation Operator and/or Driver will pay Ground Transportation Fees. Minimum Opening Balances will be required according to the following schedule:

| Type of Vehicle | Minimum Opening Balance |
|---|---|
| Taxicab, Courier or Sedan Limousine | $150 |
| Luxury Limousine, Shared-Ride Van or Mini-Bus | $300 |
| Bus | $200 |
| Fleet | Shall be calculated by the Division of Aviation or its agent as the average of the Operator's aggregate daily trips on the Commercial Roadway System over a |

Case ID: 230101658
Control No.: 23012889

thirty (30)- day period

ii.     Minimum Balance Required – Each AVI account requires a minimum balance equivalent to the amount of two Per-Trip Fees (or Egress Fees, where applicable) ("Minimum Balance"). All Commercial Ground Transportation Operators and Commercial Ground Transportation Drivers whose AVI accounts have a balance of zero dollars ($0) or less will be denied access to the Airport's Commercial Roadway System.

iii.     Account Replenishment – When a Commercial Ground Transportation Operator's (or Driver's, where applicable) AVI account reaches the Minimum Balance, the AVI account holder must replenish its AVI account in the amount equal to the applicable Minimum Opening Balance as set forth in the schedule in Section 10.K.6.f.i. herein. Notwithstanding the foregoing, Commercial Ground Transportation Operators and Drivers may replenish their respective AVI accounts more often than and in greater amounts than is required under these Rules & Regulations.

g.     Before any Commercial Ground Transportation Operator enters the Commercial Roadway System, the AVI transponder and, if applicable, the Driver ID Tag, must be scanned and registered by the AVI system reader. The AVI reader will log the entry for tracking and billing purposes and will display confirmation on the monitor display.

h.     Commercial Ground Transportation Operators, Taxicab Drivers and Couriers are liable for all Per-Trip Fees logged to any AVI transponder or Driver ID Tag (whichever is applicable) issued to it. The Division of Aviation must be notified immediately in the event of a lost, stolen or malfunctioning AVI transponder or Driver ID Tag. Commercial Ground Transportation Operators, Taxicab Drivers and Couriers will be liable for all Per-Trip Fees (if any) logged to their AVI Accounts prior to notification to the Division of Aviation of a lost, stolen or malfunctioning AVI transponder or Driver ID Tag.

i.     Commercial Ground Transportation Operators, Taxicab Drivers and Courier Drivers will have their respective AVI accounts charged and debited each time a Per-Trip fee is logged to an AVI transponder or Driver ID Tag (whichever is applicable) issued to it registers in the Airport's Commercial Roadway System. Failure to maintain an AVI account in good financial standing will result in the Division of Aviation invalidating any and all AVI transponder(s) and/or Driver ID Tag issued to that Commercial Ground Transportation Operator/Driver and suspending the privilege of operating on the Commercial Roadway System at the Airport until all past due amounts and penalties are paid in full.

September 2022

Case ID: 230101658
Control No.: 23012889

j.     AVI Account Termination – An AVI account holder may terminate its/his/her AVI account by filling out an "Account Closure" form, which is available by calling the Airport Operations Department at 215.937.6914. A refund will be made to the AVI account holder of any remaining balance in the AVI account at the time of closure and will be returned to the AVI account holder in the same manner as which it was received.

## L.    <u>ENFORCEMENT/SUSPENSIONS</u>

1.    The privilege of picking up passengers at the Airport shall be automatically suspended and the Commercial Ground Transportation Operator or Driver shall immediately cease operations and leave Airport property under the following conditions and events and such suspension shall be for the period during which such condition or event continues:

    a.    Cancellation or lapse of Commercial Ground Transportation Vehicle insurance coverage;

    b.    Expiration, for any reason, of Commercial Ground Transportation Vehicle tag or registration or state safety inspection;

    c.    Suspension, revocation, cancellation or expiration of driver's or chauffeur's license;

    d.    Loss of authority to do business in Pennsylvania or in the City of Philadelphia or loss of any other authority to engage in Commercial Ground Transportation services;

    e.    Any breach of the terms of the Ground Transportation AVI Agreement;

    f.    Failure to pay fees assessed pursuant to Section 10.K.

2.    In addition to the basis for immediate suspension listed in 10.L.1. above, a suspension of the privilege of picking up passengers at the Airport may be imposed upon a Commercial Ground Transportation Operator or Driver after a "continued failure" by the Commercial Ground Transportation Operator, or its Drivers or employees to comply with any of these Rules and Regulations. A "continued failure" to comply with these Rules and Regulations shall have occurred if the Commercial Ground Transportation Operator or Driver has received three (3) or more written notices from the City of his or her violation of these Rules and Regulations within any twelve (12) month period. Such written notice from the City may include, without limitation, a letter, parking tickets, money violations, tickets, notices of violation issued pursuant to Appendix G or other written documentation issued by the Division of

September 2022

Case ID: 230101658
Control No.: 23012889

Aviation or the  Philadelphia Police Department that is personally handed to the Commercial Ground Transportation Operator or Driver or delivered to the Commercial Ground Transportation Operator's or Driver's place of business or residence by certified mail, return receipt requested; overnight mail carrier; or hand delivery.

3.   Suspension periods for violations of regulations shall be as follows:

   a.   First suspension – not more than thirty (30) days.

   b.   Second suspension – not more than sixty (60) days.

   c.   Third suspension – not more than one (1) year.

4.   The CEO reserves the right to establish the specific dates of suspension or to waive any condition or event, which would otherwise result in a suspension.

September 2022

Case ID: 230101658
Control No.: 23012889

TAXI WORKERS' ALLIANCE OF PA. : COURT OF COMMON PLEAS
(a nonprofit corporation) : PHILADELPHIA COUNTY
4434 Lancaster Ave. :
Philadelphia, PA 19104 :
and :
ALASSAN JALLOH, individually and :
on behalf of Taxi Workers' Alliance and :
LUCKY MAN CAB CO. :
5750 Walton Ave. :
Philadelphia, PA 19143 :
:
: JANUARY TERM 2023
vs. :
: NO.
CITY OF PHILADELPHIA :
Department of Aviation :
1515 Arch Street, 14th Floor :
Philadelphia, PA 19102 :

Filed and Attested by the
Office of Judicial Records
17 JAN 2023 06:46 pm
D. KIM

**RULE TO SHOW CAUSE**

AND NOW, this    day of        , 2023 a Rule is placed upon The City of Philadelphia, Department of Aviation,  to show cause why the relief requested in the Plaintiff's Petition for Emergency Preliminary Injunction should not be granted.

Rule Returnable the _____ day of _____, 2023, in Courtroom _____, at ___A.M/P.M, Philadelphia City Hall, Broad and Market Streets, Philadelphia, PA 19102.

ALL PROCEEDINGS TO STAY IN THE MEANTIME.

IT IS SO ORDERED.

_____
                                                                            J.

Case ID: 230101658
Control No.: 23012889

| | |
|---|---|
| TAXI WORKERS' ALLIANCE OF PA. | :COURT OF COMMON PLEAS |
| (a nonprofit corporation) | :PHILADELPHIA COUNTY |
| 4434 Lancaster Ave. | : |
| Philadelphia, PA 19104 | : |
| and | : |
| ALASSAN JALLOH, individually and | : |
| on behalf of Taxi Workers' Alliance and | : |
| LUCKY MAN CAB CO. | : |
| 5750 Walton Ave. | : |
| Philadelphia, PA 19143 | : |
| | : |
| | : JANUARY TERM 2023 |
| vs. | : |
| | : NO. |
| CITY OF PHILADELPHIA | : |
| Department of Aviation | : |
| 1515 Arch Street, 14th Floor | : |
| Philadelphia, PA 19102 | : |

ORDER

AND NOW, this          day of                    , 2023, upon consideration of Plaintiff's Petition for
Preliminary Injunction, the reply thereto, and upon a hearing, the Petition is GRANTED.  The City is
ENJOINED from changing the taxicab zone from where it is presently.  It is so ordered.

_____
                                                      J.

Case ID: 230101658
Control No.: 23012889

**ELI GABAY, ESQUIRE**
**Identification No. 39983**
**1628 J.F.K. Boulevard**
**Suite 2200**
**Philadelphia, PA  19103**
**(215) 665-1100**
**LIONEL ARTOM-GINZBURG, ESQUIRE**
**Identification No. 88644**
**834 Chestnut Street, Suite 206**
**Philadelphia, PA 19107**
**(215) 925-2915**

| | |
|---|---|
| TAXI WORKERS' ALLIANCE OF PA. | :COURT OF COMMON PLEAS |
| (a nonprofit corporation) | :PHILADELPHIA COUNTY |
| 4434 Lancaster Ave. | : |
| Philadelphia, PA 19104 | : |
| and | : |
| ALASSAN JALLOH, individually and | : |
| on behalf of Taxi Workers' Alliance and | : |
| LUCKY MAN CAB CO. | : |
| 5750 Walton Ave. | : |
| Philadelphia, PA 19143 | : |
| | : |
| | : JANUARY TERM 2023 |
| vs. | : |
| | : NO. |
| CITY OF PHILADELPHIA | : |
| Department of Aviation | : |
| 1515 Arch Street, 14th Floor | : |
| Philadelphia, PA 19102 | : |

PETITION FOR PRELIMINARY INJUNCTION

**NOTICE**

You have been sued in court.  If you wish to defend against the claim set forth in the following pages, you must take action within twenty (20) days after this complaint and notices are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
Telephone No.: 215-238-1701

Case ID: 230101658
Control No.: 23012889

### AVISO

Len han demandada a usted en la carte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene viente (20) dias asentar una compaensencia escritia o enpersona o con un abogadad y demandas en contra de su persona.  Sea avisoado que si usted noo se defiende, la corte tomara medidas y puededecidir a favor del demandante y requiere que usted cumpia con todas las proviciones de esta demanda.  Usted puede perder dinero o sus proiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE.  SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA ENCUENTRA ESTITA ABAJO PARA AVERIGUAR DONDE PUEDE CONSEGUIR ASTENCIA LEGA.

ASOCIACION DE LICENCIADOS DE FILADELFIA SERVICIO, DE REFERENCIA E INFORMACION LEGAL
One Reading Center
Filadelfia, Pennsylvania 19107
Telefono: 215-238-1701

Case ID: 230101658
Control No.: 23012889

## GENERAL AVERMENTS

1. Plaintiff, Taxi Workers Alliance, is a nonprofit corporation located in Philadelphia, PA.

2. Plaintiff, Alassan Jalloh, is the Vice-President of the Taxi Workers' Alliance, with a place of business in Philadelphia County, and a PPA taxi medallion owner and a taxi driver in the City of Philadelphia, and therefore an interested party in the matter.

3. Plaintiff, Lucky Man Cab Co., is a Pennsylvania corporation with a principal place of business in Philadelphia, PA, owned by Plaintiff Alassan Jalloh.

4. Defendant, City of Philadelphia, Aviation Department, is a department of a municipality of the first class of the Commonwealth of Pennsylvania.

## BACKGROUND

5. The City of Philadelphia is the owner and operator of the Philadelphia International Airport.  The City of Philadelphia has, in a meeting which was held on January 16, 2023, announced it is switching the zones of taxicabs and rideshare services at the Airport effective immediately.

6. The City of Philadelphia operates the Airport through the Department of Aviation, which was created by a voter referendum of City residents and prior to December 2022, was part of the Department of Commerce, and the Division of Aviation.

7. Pursuant to its Administrative powers under the Home Rule Charter, §4-300, the City has promulgated regulations ("Regulations") for ground service transportation at the Airport.  A copy of those regulations, dated November, 2022, is attached hereto as Exhibit "A."

8. Plaintiff Jalloh is a medallion owner, through Plaintiff Lucky Man Cab Co.,  and a taxi driver who works at the Philadelphia International Airport pursuant to the Regulations.

9. Pursuant to the Regulations, taxi drivers are directed to enter the airport, where they are to enter an area designated as the Taxicab Staging Area, where they are then dispatched on a first-come first-served basis to Taxicab Feed Lines, and then to Taxicab Zones (the number of the taxi zone is undefined in the Regulations), where they may be hailed by the public. See Regulations, 10(G)(3)(b)(i).

10. Presently, the Zone designated for Taxicabs is Zone 5, which is within the immediate view of the public when they exit the terminals.

11. The placement of taxis in Zone 5, which is the Zone most immediate to the exit of the terminal, is important to note, as visibility is paramount to this public transportation mode known as taxicabs.

Case ID: 230101658
Control No.: 23012889

12. Taxicabs, which do not have the an "app" may only be hailed upon request of the user,[1] so being within the sight of customers is necessary to (a) in order to prominently present to them the taxicab vehicles, and process them immediately to their destinations and (b) indicate the amount of wait time for a taxicab.

13. The rideshare companies (as defined by Regulations 10(K)(4)(a)) have their own designated zone, Zone 7, on the other side of the terminal road, where they are to wait for the app to send them to the terminal.  Zone 7 was "carved out" after they were moved from the other side of the terminal altogether-- front of the terminal-- due to rideshare drivers creating an extreme traffic problem and confusion whilst the typical rideshare driver was negotiating between the App and the would-be passenger via the App while on course or in front of the terminal.  There is no mention of a Zone for rideshare companies anywhere in the Regulations-- it was granted to them without express authority in the Regulations.

14. Zone 7 is outside the view of the public, however, it is not as necessary that the Rideshare companies be in view of the public in view of the fact that they are hailed by phone application, not by people actually waving at them.

15. The Limousine companies, ("Limousines") have their own Zone, Zone 6, which is behind Zone 5; Limousines are reserved in advance, per the regulations, 10(H)(3)(d).

16. The Division of Aviation has now announced, without amending the Regulations, and without proper regulatory consideration of the affected parties, that the Rideshare companies will be assigned to Zone 5, and the Taxicabs will be moved to Zone 7.

17. This will have an adverse effect of further devastating the taxicab industry, which is still suffering from the Rideshare companies' entry into the market in 2013, causing tens of millions of dollars in losses in to the Taxicab business, that is largely still family-owned.

## PETITION FOR PRELIMINARY INJUNCTION

18. In Warhime v. Warhime, 860 A.2d 41, 46-47 (Pa. 2004), the Pennsylvania Supreme Court set forth a six point test for the granting of a preliminary injunction, to wit:

*(1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction*

---

[1]   While there are Apps connected to particular taxi dispatchers, a uniform App platform for all PPA Medallion Taxis is not readily in use.

Case ID: 230101658
Control No.: 23012889

*than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect the public interest."* Id.

19. Taxi workers and their families will suffer immediate and irreparable harm, perhaps leading to the final blow of death of their industry, if they are not permitted to stay in Zone 5, as they will be outside the view of the public, and "out of sight, out of mind."

20. An injunction would maintain the status quo, that is, taxicabs in Zone 5 and rideshare vehicles in Zone 7.

21. In a meeting between Airport officials and the Plaintiffs, the only stated reason for the move from Zone 5 to Zone 7 is that rideshare passenger are required to walk across the street to Zone 7. Airport official cited the possibility of someone being hit in a marked crosswalk; although, no statistics have been made available indicating that such events have occurred.

22. All would-be passengers on the way to Zone 7 have to use a zebra crosswalk. Proper use of this crosswalk eliminates the danger cited by the Defendant for rideshare passengers.

23. For that matter, any such danger posed in crossing the street by any would-be passengers is essentially the same for taxicabs or for rideshare passengers.

24. The zone granted to rideshare drivers is in the absence of regulation requiring same, as zones are specified as existing for taxicabs and limousines.

25. As an arbitrary decision of the CEO of the Airport system, this matter is actionable under the City Charter, 4-2700(e), and a right to relief is clear, as this ill-conceived plan will have the effect of putting the taxi industry out of business once and for all.

26. The proposed injunction places all parties back in the status quo position, but forces the City of Philadelphia to actually promulgate regulations to deal with this situation rather than dictate by *fiat*.

27. The public interest is met by the granting of this injunction, in that it would force the City of Philadelphia to follow its own regulations when making drastic changes to public conveniences.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an Order in the form attached hereto, GRANTING Plaintiff's Preliminary Injunction against Defendant.

Respectfully submitted,

Case ID: 230101658
Control No.: 23012889

ELI GABAY, ESQUIRE

LIONEL ARTOM-GINZBURG, ESQUIRE

January 17, 2023

Case ID: 230101658
Control No.: 23012889

**ELI GABAY, ESQUIRE**
**Identification No. 39983**
**1628 J.F.K. Boulevard**
**Suite 2200**
**Philadelphia, PA 19103**
**(215) 665-1100**
**LIONEL ARTOM-GINZBURG, ESQUIRE**
**Identification No. 88644**
**834 Chestnut Street, Suite 206**
**Philadelphia, PA 19107**
**(215) 925-2915**

| | |
|---|---|
| TAXI WORKERS' ALLIANCE OF PA. | :COURT OF COMMON PLEAS |
| (a nonprofit corporation) | :PHILADELPHIA COUNTY |
| 4434 Lancaster Ave. | : |
| Philadelphia, PA 19104 | : |
| and | : |
| ALASSAN JALLOH, individually and | : |
| on behalf of Taxi Workers' Alliance and | : |
| LUCKY MAN CAB CO. | : |
| 5750 Walton Ave. | : |
| Philadelphia, PA 19143 | : |
| | : |
| | : JANUARY TERM 2023 |
| vs. | : |
| | : NO. |
| CITY OF PHILADELPHIA | : |
| Department of Aviation | : |
| 1515 Arch Street, 14th Floor | : |
| Philadelphia, PA 19102 | : |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S PETITION FOR PRELIMINARY INJUNCTION

I. Matter before the Court
    Petition for Preliminary Objection

II. Question presented:
    A. Have the Plaintiffs presented sufficient facts to be granted an injunction preventing their move to another airport location?

    SUGGESTED ANSWER: YES

III. Facts.

    The City of Philadelphia is the owner and operator of the Philadelphia International Airport.

Case ID: 230101658
Control No.: 23012889

The City of Philadelphia operates the Airport through the Department of Aviation, which was created by a voter referendum of City residents and prior to December 2022, was part of the Department of Commerce, and the Division of Aviation.  The City of Philadelphia has, in a meeting which was held on January 16, 2023, announced it is switching the zones of taxicabs and rideshare services at the Airport.

Pursuant to its Administrative powers under the Home Rule Charter, §4-300, the City has promulgated regulations ("Regulations") for ground service transportation at the Airport.  A copy of those regulations, dated November, 2022, is attached hereto as Exhibit "A."

Plaintiff Jalloh is a medallion owner, through Plaintiff Lucky Man Cab Co.,  and a taxi driver who works at the Philadelphia International Airport pursuant to the Regulations.

Pursuant to the Regulations, taxi drivers are directed to enter the airport, where they are to enter an area designated as the Taxicab Staging Area, where they are then dispatched on a first-come first-served basis to Taxicab Feed Lines, and then to Taxicab Zones (the number of the taxi zone is undefined in the Regulations), where they may be hailed by the public. See Regulations, 10(G)(3)(b)(i).

Presently, the Zone designated for Taxicabs is Zone 5, which is within the immediate view of the public when they exit the terminals.

The placement of taxis in Zone 5, which is the Zone most immediate to the exit of the terminal, is important to note, as visibility is paramount to this public transportation mode known as taxicabs.

Taxicabs, which do not have the an "app" may only be hailed upon request of the user,[2] so being within the sight of customers is necessary to (a) in order to prominently present to them the taxicab vehicles, and process them immediately to their destinations and (b) indicate the amount of wait time for a taxicab.

The rideshare companies (as defined by Regulations 10(K)(4)(a)) have their own designated zone, Zone 7, on the other side of the terminal road, where they are to wait for the app to send them to the terminal.  Zone 7 was "carved out" after they were moved from the other side of the terminal altogether-- front of the terminal-- due to rideshare drivers creating an extreme traffic problem and confusion whilst the typical rideshare driver was negotiating between the App and the would-be passenger via the App while on course or in front of the terminal.  There is no mention of a Zone for

---

[2]   While there are Apps connected to particular taxi dispatchers, a uniform App platform for all PPA Medallion Taxis is not readily in use.

Case ID: 230101658
Control No.: 23012889

rideshare companies anywhere in the Regulations-- it was granted to them without express authority in the Regulations.

Zone 7 is outside the view of the public, however, it is not as necessary that the Rideshare companies be in view of the public in view of the fact that they are hailed by phone application, not by people actually waving at them.

The Limousine companies, ("Limousines") have their own Zone, Zone 6, which is behind Zone 5; Limousines are reserved in advance, per the regulations, 10(H)(3)(d).

The Division of Aviation has now announced, without amending the Regulations, and without proper regulatory consideration of the affected parties, that the Rideshare companies will be assigned to Zone 5, and the Taxicabs will be moved to Zone 7.

This will have an adverse effect of further devastating the taxicab industry, which is still suffering from the Rideshare companies' entry into the market in 2013, causing tens of millions of dollars in losses in to the Taxicab business, that is largely still family-owned.

IV.  Argument.

In Warhime v. Warhime, 860 A.2d 41, 46-47 (Pa. 2004), the Pennsylvania Supreme Court set forth a six point test for the granting of a preliminary injunction, to wit:

*(1) "that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages"; 2) "that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings"; 3) "that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct"; 4) "that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits"; 5) "that the injunction it seeks is reasonably suited to abate the offending activity"; and, 6) "that a preliminary injunction will not adversely affect the public interest." Id.*

Taxi workers and their families will suffer immediate and irreparable harm, perhaps leading to the final blow of death of their industry, if they are not permitted to stay in Zone 5, as they will be outside the view of the public, and "out of sight, out of mind."

An injunction would maintain the status quo, that is, taxicabs in Zone 5 and rideshare vehicles in Zone 7.

In a meeting between Airport officials and the Plaintiffs, the only stated reason for the move from Zone 5 to Zone 7 is that rideshare passengers are required to walk across the street to Zone 7.

Case ID: 230101658
Control No.: 23012889

Airport official cited the possibility of someone being hit in a marked crosswalk; although, no statistics have been made available indicating that such events have occurred.

All would-be passengers on the way to Zone 7 have to use a zebra crosswalk.   Proper use of this crosswalk eliminates the danger cited by the Defendant for rideshare passengers.

For that matter, any such danger posed in crossing the street by any would-be passengers is essentially the same for taxicabs or for rideshare passengers.

The zone granted to rideshare drivers is in the absence of regulation requiring same, as zones are specified as existing for taxicabs and limousines.

As an arbitrary decision of the CEO of the Airport system, this matter is actionable under the City Charter, 4-2700(e), and a right to relief is clear, as this ill-conceived plan will have the effect of putting the taxi industry out of business once and for all.

The proposed injunction places all parties back in the status quo position, but forces the City of Philadelphia to actually promulgate regulations to deal with this situation rather than dictate by *fiat*.

The public interest is met by the granting of this injunction, in that it would force the City of Philadelphia to follow its own regulations when making drastic changes to public conveniences.


V.  Requested Relief.

Plaintiffs respectfully request that this Honorable Court enter an Order in the form attached hereto, GRANTING Plaintiff's Preliminary Injunction against Defendant.

Respectfully submitted,


ELI GABAY, ESQUIRE

LIONEL ARTOM-GINZBURG, ESQUIRE


January 17, 2023

Case ID: 230101658
Control No.: 23012889

VERIFICATION

I, Alassan Jalloh, of 5750 Walton Ave, Philadelphia, PA 19143, am a Plaintiff in the above-captioned action, and the Vice President of the Taxi Workers Alliance, and state that the facts contained in the preceding Complaint and Petition for Preliminary Injunction are true to the best of my knowledge, information, and belief.  I make this statement pursuant to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities.


January 16,  2023                                          _____
                                                                          Alassan Jalloh